UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Betty Ann Brookes,

        Plaintiff,

        v.                                            Civil Action No. 2:13-cv-215

Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
### (Docs. 13, 14)

Plaintiff Betty Ann Brookes brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits.  Pending before the Court are Brookes's motion to reverse the Commissioner's decision (Doc. 13), and the Commissioner's motion to affirm the same (Doc. 14).  For the reasons stated below, I recommend that Brookes's motion be GRANTED, in part; the Commissioner's motion be DENIED; and the matter be REMANDED for further proceedings and a new decision.

## Background

Brookes was 53 years old on her alleged disability onset date of January 1, 2004. She did not complete high school but obtained a GED.  She has work experience as a

housekeeper, a respite care provider, and an animal hospital worker. She has been married to her husband since 1985, and has one adult child and two adult stepchildren.

Brookes has multiple physical ailments including arthritis, degenerative joint disease, and pain in her neck, back, shoulders, wrists, and knees. She also has a history of social phobia and depression. She is obese, and smokes about one pack of cigarettes and drinks approximately eight cups of coffee daily. (AR 683–84.) Brookes testified at the administrative hearing that, on a typical day, she feeds her cats, washes a few dishes, prepares dinner, reads, watches a movie, lies down periodically, and frequently sleeps because of depression and pain. (AR 68–69, 86–87.) She further testified that, as a result of her anxiety around crowds, she does not attend her grandchildren's birthday parties and other functions, and is uncomfortable going to the grocery store. (AR 69–70.) Brookes's husband confirmed her testimony, and added that Brookes suffers from "massive headaches" (AR 72) and sits in a recliner elevating her feet while she reads or watches a movie in the evening (AR 73). Brookes's stepdaughter corroborated Brookes's testimony that her social anxiety prevented her from attending family functions, and stated that she and her children see Brookes only approximately two-to-four times annually because the 30-minute drive between their houses "is too much for [Brookes]." (AR 75.) Brookes's stepdaughter further testified that Brookes's "pain and discomfort is visual and . . . certainly impacts our family." (*Id.*)

In August 2009, Brookes filed an application for social security disability insurance benefits. (AR 101, 232–33.) She alleges that she became unable to work on January 1, 2004, as a result of degenerative arthritis; neck, back, and knee pain;

thickening in the left ventricle of her heart; varicose veins; and extreme fatigue.  (AR 283.)  Brookes's application was denied initially and upon reconsideration, and she timely requested an administrative hearing.  The hearing was conducted on January 31, 2011 by Administrative Law Judge ("ALJ") Thomas Merrill.  (AR 79–91.) Brookes appeared and testified, representing herself.  A vocational expert ("VE") also appeared and testified at the hearing.  A few days after the hearing, the ALJ issued a decision finding that Brookes was not disabled under the Social Security Act from her alleged onset date through the date of the decision.  (AR 108–16.)  Thereafter, the Decision Review Board ("DRB") vacated the ALJ's decision and remanded to the ALJ for further evaluation of the evidence and resolution of several issues.  (AR 122–24.)

On May 14, 2012, ALJ Merrill conducted a second administrative hearing.  (AR 27–78.)  Brookes again appeared and testified, this time represented by counsel.  A VE, Brookes's husband, and Brookes's stepdaughter also testified at the hearing. On July 6, 2012, the ALJ issued a second decision, again finding that Brookes was not disabled during the relevant period.  (AR 9–21.)  The Appeals Council denied Brookes's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–3.)  Having exhausted her administrative remedies, Brookes filed the Complaint in this action on August 8, 2013.  (Doc. 4.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

4

Employing this sequential analysis, ALJ Merrill first determined that Brookes had not engaged in substantial gainful activity since her alleged onset date of January 1, 2004. (AR 11.)  At step two, the ALJ found that Brookes had the severe impairments of degenerative disc disease of the cervical spine and osteoarthritis of the bilateral knees. (AR 12.)  Conversely, the ALJ found that "the record does not support depression or anxiety as a medically determinable impairment" (AR 13), and that Brookes's obesity was non-severe (AR 14.)  At step three, the ALJ found that none of Brooke's impairments, alone or in combination, met or medically equaled a listed impairment. (*Id.*)  Next, the ALJ determined that Brookes had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b), with the following additional conditions: "she may lift up to twenty pounds occasionally and ten pounds frequently; she may sit for up to six hours and stand or walk for up to six hours in an eight-hour day; and she may only occasionally climb, balance, stoop, kneel, couch[,] or crawl."  (*Id.*)

In determining Brookes's RFC, the ALJ gave significant weight to the opinions of medical expert Dr. Donald Goldman, an orthopedic surgeon who testified at the second administrative hearing that there was a lack of objective medical evidence to support Brookes's allegations of significant functional limitation.  (AR 17–18; *see* AR 33–41.) The ALJ gave "some weight" to agency consultant Dr. Leslie Abramson's opinions, which were "generally consistent" with those of Dr. Goldman.  (AR 20; *see* AR 658–65.) In contrast, the ALJ gave "very little weight" to the opinions of Brookes's longstanding treating primary care physician, Dr. Mark Hamilton (AR 18), who opined that Brookes was significantly limited in her physical and mental ability to function (AR 688–706,

727–35).  The ALJ also gave "little weight" to the opinions of consulting psychiatrist Dr. Theodore Miller (AR 13), who diagnosed Brookes with social anxiety disorder and severe depression (AR 724–25).  The ALJ gave "some weight" to the opinions of examining consultant Dr. Daniel Wing (AR 19), who opined that "nothing in [his examination of Brookes] would necessarily prevent her from working at [a] sedentary level" (AR 685).[1]  Finally, the ALJ gave "little weight" to the opinions of examining consultant Dr. John Leppman (AR 19), who opined that, given her "well[-]documented" musculoskeletal problems, Brookes would not be able to perform her past work as a chambermaid, and "other jobs involving physical stress [would also be] problematic" (AR 656).

At step four, applying the ALJ's RFC determination and considering the VE's testimony, the ALJ found that Brookes was capable of performing her past relevant work as a housekeeper or respite provider/companion.  (AR 20.)  The ALJ concluded that Brookes had not been under a disability from her alleged disability onset date of January 1, 2004 through the date of the decision.  (*Id.*)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

---

[1]  Dr. Wing stated that Brookes "has an advanced syndrome of early aging . . . – she is a smoker and has the metabolic syndrome with truncal obesity, hypertension, and elevated lipids; she has widespread degenerative joint disease involving the spine and possibly other joints."  (AR 685.)  He did not see "a good therapeutic plan to move [Brookes] back to good health," but recommended that she "stop smoking, reduce her coffee intake to 2 cups a day . . .[,] and attend physical therapy to learn . . . stretching exercises."  (*Id.*)

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  A person will be found disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

     In considering a Commissioner's disability decision, the court "review[s] the

administrative record *de novo* to determine whether there is substantial evidence

supporting the . . . decision and whether the Commissioner applied the correct legal

standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of

the Commissioner's decision is thus limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.

Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder.").  "Substantial evidence" is more than

a mere scintilla; it means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the

Social Security Act is "a remedial statute to be broadly construed and liberally applied."

*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

**I.    ALJ's Step-Two Findings Regarding Depression, Social Anxiety Disorder, Obesity, and Stasis Dermatitis**

Brookes argues that the ALJ erred in failing to identify her depression, social anxiety disorder, obesity, and stasis dermatitis[2] as "severe impairments" at step two.  As stated above, the ALJ found that Brookes's depression and anxiety were not medically determinable impairments and thus did not consider them in determining Brookes's RFC. (AR 12–13.)  Also at step two, the ALJ found that Brookes's obesity was non-severe, stating that "no medical evidence of record identifies any work-related limitations stemming from obesity."  (AR 13.)  The ALJ did not discuss Brookes's stasis dermatitis at step two and did not account for any limitations caused thereby at later steps in the sequential analysis.

Under the regulations, a claimant may be found disabled only if he or she has a "*medically determinable physical or mental impairment* which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a) (emphasis added).  To be "medically determinable," the impairment must "result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques . . . [and] must be established by medical evidence consisting of signs, symptoms, and laboratory findings . . . ."  20 C.F.R. § 404.1508; *see*

---

[2]  "Stasis dermatitis" is defined as "erythema and scaling of the lower extremities due to impaired venous circulation, seen commonly in older women or secondary to deep vein thrombosis, the latter with rapid onset and swelling."  *Stedman's Medical Dictionary* (27th ed. 2000), *available at* Westlaw STEDMANS 107520.

SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  There must be evidence from "acceptable medical sources," including licensed physicians and psychologists, to establish that an impairment is medically determinable.  20 C.F.R. § 404.1513(a).  "If there is no medically determinable . . . impairment[], or if there is a medically determinable . . . impairment[] but the impairment[] could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities."  SSR 96-7p, 1996 WL 374186, at *2.

        Here, the record contains evidence—including opinions from acceptable medical sources and medically acceptable clinical evidence of psychological abnormalities— demonstrating that Brookes suffered from depression and anxiety during the relevant period.  Specifically, in May and August 2009, Brookes's treating primary care physician, Dr. Hamilton, noted that Brookes was complaining of fatigue occurring "all the time" (AR 368) and was likely suffering from depression (AR 364, 369, 377).  His plan was to have blood work completed and consider prescribing an antidepressant depending on the results.  (AR 369.)  In January 2011, Dr. Hamilton recorded that Brookes presented for a recheck of her depression and her symptoms again included fatigue.  (AR 671.)  He stated: "Since diagnosis[,] the disease has been worsening (medication has not helped at all, she feels more depressed[])."  (*Id.*)  Dr. Hamilton decided to taper Brookes off her current medication and consider a different one at her next appointment.  (AR 673.)  In a February 2012 note to Dr. Hamilton, consulting psychiatrist Dr. Miller noted that Brookes was referred to him "with worsening symptoms [of depression]" and described Brookes as having "lifelong problems with

anxiety and later onset depression." (AR 723.) Dr. Miller stated that Brookes was

hospitalized at the Brattleboro Retreat at around the age of 14 following a suicide

attempt. (*Id.*; *see also* AR 323.) His "initial clinical impression" of Brookes was that she

had a "lifelong history of social phobia and tendency to depression." (AR 724.) Dr.

Miller diagnosed Brookes with "[s]ocial anxiety disorder" and "[m]ajor depression,

recurrent, severe, in partial remission" (AR 725), and prescribed medication to treat these

conditions (AR 724).[3] Finally, in April 2012, Dr. Hamilton reviewed Brookes's

psychiatric systems and found that both anxiety and depression were present.[4] (AR 712.)

Around the same time, Dr. Hamilton stated in an anxiety "Data Sheet" that Brookes had

"probable social phobia" (AR 728) and was "markedly limited" in her ability to interact

with others (AR 730).

    Thus, two acceptable medical sources,[5] Dr. Miller and Dr. Hamilton, each having

examined Brookes and Dr. Hamilton having an extensive treatment relationship with her,

diagnosed Brookes with depression and social anxiety during the relevant period, and

prescribed medication to treat these conditions. Objective medical evidence like this,

---

[3] The ALJ gave "little weight" to Dr. Miller's opinions for only one stated reason: "[his] one-time evaluation was made a year after [Brookes] was denied benefits based upon her application for physical conditions, and after the [DRB] raised depression as an issue." (AR 13.) The ALJ provides no further analysis explaining why this is a valid reason to give little weight to the opinions of a physician, particularly a physician who examined the claimant. Moreover, the ALJ does not explain why the opinions of Dr. Miller, who conducted a clinical interview with Brookes, are worthy of less value than those of medical expert Dr. Goldman and agency consultant Dr. Abramson, who neither interviewed nor examined Brookes.

[4] Confusingly, Dr. Hamilton stated in the same office note: "Depressed. *Not* Anxious." (*Id.* (emphasis added).)

[5] "Acceptable medical sources" are defined in the regulations to include "[l]icensed physicians," which both Dr. Hamilton and Dr. Miller are. 20 C.F.R. § 404.1513(a)(1).

including a diagnosis and ongoing treatment with prescription medication, provides sufficient evidence to require more than mere dismissal of claims at the second step of the ALJ's sequential analysis. *Stovall v. Astrue*, Civil Action No. 2:11-cv-00107-SAA, 2013 WL 1873584, at *3 (N.D. Miss. May 3, 2013) (citing *Scroggins v. Astrue*, 598 F. Supp. 2d 800, 806 (N.D. Tex. 2009)); *see Ivy v. Sullivan*, 898 F.2d 1045,1048–49 (5th Cir. 1990) ("Medically acceptable evidence includes observations made by a physician during physical examination and is not limited to the narrow strictures of laboratory findings or test[] results."). One district court aptly applied this principle in the context of a depression claim, concluding as follows: "[I]f the record supports the claimant's allegations of depression by medical records showing diagnosis, physicians prescribing medication for depression[,] and follow-up visits for prescription refills[;] statements from the treating physician and supporting medical evidence cannot be dismissed or disregarded by the ALJ." *Stovall*, 2013 WL 1873584, at *4. The Tenth Circuit similarly held that a claimant's diagnosis of depression and treatment with medication is sufficient evidence to establish a medically determinable mental impairment and therefore trigger the ALJ's requirement to evaluate the severity of the impairment in accordance with 20 C.F.R. § 404.1520(a). *See Lamb v. Barnhart*, 85 F. App'x 52, 57–58 (10th Cir. 2003). The ALJ erred in dismissing the opinions of Drs. Miller and Hamilton with respect to Brookes's depression and anxiety, and in finding that Brookes's depression and anxiety were not medically determinable impairments.

Not only does the record contain substantial evidence contrary to the ALJ's decision that Brookes's depression and anxiety were not medically determinable

impairments, but the ALJ also made specific errors in his discussion of Brookes's depression in his decision. First, the ALJ stated that "depression was not added to [Brookes's] past medical history or [her] problem list" in Dr. Hamilton's October 2010 medical records. (AR 12 (citing AR 666–70).) In fact, Dr. Hamilton listed "depression" as an ongoing problem for Brookes in many of his treatment notes, including in a note from October 2010. (*See, e.g.*, AR 364, 369, 377, 666–67, 671–73, 675, 712.) Second, the ALJ stated that paroxetine was "a medication [Dr. Hamilton] had prescribed for [Brookes's] arthritis." (AR 12.) But paroxetine is in fact an antidepressant, *see* J.E. Schmidt, *4-P Attorneys' Dictionary of Medicine* P-87806 (2009), *available at* Lexis DICMED, and it was prescribed by Dr. Hamilton to treat Brookes's depression (AR 671, 673). Specifically, in January 2011, listing "Depression" under a review of psychiatric systems and neuropsychiatric physical examination findings, Dr. Hamilton noted that Brookes's depression had "gotten worse since starting paroxetine." (AR 672.) He concluded: "I will stop paroxetine as she is worse on it[,] and [I will] get some labs." (AR 673.)

Third, the ALJ gave "no weight" to Brookes's positive "PHQ-9" score because it "is a self-report instrument without emphasis or interpretation." (AR 13.) The ALJ cited no authority to support this assessment. The Patient Health Questionnaire-9 ("PHQ-9") self-assessment test is a screening tool for depression based on symptom criteria listed in the Diagnostic and Statistical Manual of Mental Disorders and ranked on a scale of severity. *Ward v. Comm'r of Soc. Sec.*, No. 11 Civ. 6157(PAE), 2014 WL 279509, at *6 n.14 (S.D.N.Y. Jan. 24, 2014) (citing *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 174 n.8

(E.D.N.Y. 2011)).  A rating of 1–5 equates with minimal depression, 5–9 with mild depression, 10–14 with moderate depression, 15–19 with moderately severe depression, and 20–27 with severe depression.  *Id.*  In a January 2011 treatment note, Dr. Hamilton recorded that Brookes had received a PHQ-9 score of 20.  (AR 671.)  Therefore, her score fell within the low end of the "severe depression" range.  The ALJ should not have given "no weight" (AR 13) to this score.  *See Camilo v. Comm'r of Soc. Sec.*, No. 11 Civ. 1345(DAB)(MHD), 2013 WL 5692435, at *25–26 (S.D.N.Y. Oct. 2, 2013) (ALJ erred in failing to mention plaintiff's PHQ-9 score, "thus omitting a key record of plaintiff's self-reported symptoms during the relevant period").

Fourth, despite the Commissioner's assertion that Brookes did not list depression as one of her impairments in her disability application, she stated in her application paperwork that one of the conditions limiting her ability to work was "extreme fatigue" (AR 283), which the record reflects is a symptom of her depression.  And in a September 2009 Function Report, Brookes stated that she experienced "[e]xtreme fatigue – [doctor] thinks pain and[/]or depression."  (AR 296.)  These statements, together with the evidence discussed above, suffice to demonstrate that Brookes's depression and anxiety were medically determinable impairments.  Accordingly, I find that the ALJ erred in finding to the contrary.  I cannot find this error harmless because the ALJ failed to account for any mental impairments on their own or in combination with any other impairments at later steps of the sequential analysis, including in determining Brookes's RFC.  *See* SSR 96-3p, 1996 WL 374181, at *2 (July 2, 1996) (symptom-related limitations will be considered only if the impairments to which they are related are

"medically determinable").  Remand is necessary for the ALJ to properly evaluate
Brookes's depression and anxiety at step two.  In particular, the ALJ should determine
whether these impairments were "severe" under the regulations during the alleged
disability period, i.e., whether they "significantly limit[ed] [Brookes's] . . . ability to do
basic work activities," 20 C.F.R. § 404.1520(c), alone or in combination.  *See* 20 C.F.R. §
404.1523 ("[W]e will consider the combined effect of all of your impairments without
regard to whether any such impairment, if considered separately, would be of sufficient
severity.  If we do find a medically severe combination of impairments, the combined
impact of the impairments will be considered throughout the disability determination
process.").  If necessary, the ALJ should recontact Drs. Hamilton and Miller to obtain
their opinions on how and to what extent Brookes's mental impairments limited her
ability to function during the relevant period.

On the other hand, the record does not support Brookes's assertion that either her
obesity or her stasis dermatitis rose to the level of a severe impairment.  Thus, I find no
error in the ALJ's analysis of those issues.  Regarding Brookes's stasis dermatitis, the
record reflects that Brookes applied a topical steroid cream, wore compression hose, and
elevated her legs periodically to address the condition.  (AR 364, 366, 404, 666, 671.)
Although Dr. Hamilton stated in a May 2012 letter that Brookes's stasis dermatitis
"require[d] her to elevate her legs 2-3 times a day" (AR 768), this opinion is inconsistent
with other evidence including Dr. Hamilton's own earlier opinion that Brookes did not
need to elevate her legs with prolonged sitting (AR 695).  Moreover, it is unclear on what
approximate date Brookes was first required to elevate her legs, for what period of time

14

she needed to continue elevating them, and for what length of time she elevated them

each time.  Regarding Brookes's obesity, the ALJ accurately stated that the treatment

notes "barely document obesity" and that "[t]he only mention of [Brookes's] weight was

her need to reduce [it] as a variable factor related to her chest pain complaints."  (AR 14.)

Overall, there is a lack of evidence supporting work-related limitations resulting from

either Brookes's obesity or her stasis dermatitis.

## II.     Remaining Arguments

Because this action should be remanded for further evaluation consistent with the

above recommendations, the Court need not address Brookes's remaining arguments.  In

an attempt to provide guidance on remand, however, I note that a new analysis of the

medical opinions is also warranted.  In particular, the opinions of treating physician Dr.

Hamilton and medical expert Dr. Goldman should be reconsidered, and the ALJ should

contemplate recontacting these providers for clarification of their opinions.

Regarding Dr. Goldman, there are three particular areas of confusion in his

testimony at the administrative hearing.  First, his opinions appear to be largely based on

his mistaken belief that there was a lack of imaging studies in the record.  He made the

following statements at the hearing: "they refer to degenerative changes on an x-ray, . . .

but I see no MRI or CAT scan of the cervical area" (AR 35); "it's very . . . difficult for

anybody to determine somebody's function if they don't have some of the minimal

diagnostic testing to even document the fact . . . how come there's no MRI?  How come

there's no CAT scan?" (AR 40–41); "the doctor himself said there's no . . . objective

testing, . . . no real examination" (AR 41); and "there's no CT or MRI of the lumbar

spine" (AR 47).  The record, however, clearly contains imaging studies.  Specifically,

there are imaging studies of Brookes's cervical spine from November and December

2004 and May 2009.  (AR 428, 475, 610, 616.)  Dr. Hamilton referenced at least one of

these reports in a May 2009 office note, stating, "Neck getting worse[; s]he did have an

abnormal MRI in 2004," and, "Plans: MRI OF CERVICAL SPINE . . . (Chronic neck

pain, getting much worse)."  (AR 379.)  The record also contains May 2006 imaging

studies of Brookes's lumbar spine (AR 550), and May and July 2009 MRIs of Brookes's

knees (AR 472, 478–79).  Dr. Leppman, who prepared a report based on his review of the

record and examination of Brookes, acknowledged these imaging studies in his report,

stating that Brookes's musculoskeletal problems, including degenerative arthritic changes

in the cervical spine, are "well documented" and "have caused her symptoms which are

compatible with the imaging findings."  (AR 656.)  It appears from his testimony at the

administrative hearing that Dr. Goldman was unaware of these imaging studies.

Second, Dr. Goldman testified that he saw no evidence of loss of range of motion

in Brookes's legs, no instability, no pain, no atrophy, and no weakness.  (AR 37.)  But in

July 2009, Dr. Hamilton observed as follows on examination: "moderate crepitus when

moving the right knee[;] . . . cannot completely flex the right knee and it is tender on

weight[-]bearing."  (AR 375.)  Dr. Hamilton also noted that Brookes was having bilateral

knee pain, along with neck and wrist pain.  (*Id.*)  In June 2010, Dr. Wing noted on

examination that Brookes had "a mildly antalgic gait," was "slightly favoring the right

lower extremity," and had pain and tenderness in various areas.  (AR 684.)  And in

October 2010 and January 2011, Dr. Hamilton recorded that Brookes had pain in her joints, neck, shoulder, back, and knees.  (AR 667, 672.)

Third and finally, Dr. Goldman testified on the one hand that he "would not agree" that Brookes experienced pain, stiffness, weakness, and fatigue as a result of degenerative joint disease and inflammatory arthritis (AR 43), but then contradictorily stated that he "do[es] not dispute the fact [that Brookes] has pain" (AR 44).

There are also areas of confusion regarding Dr. Hamilton's opinions.  First, in April 2012, Dr. Hamilton opined that Brookes could "never" return to work and stated that there is objective evidence of nerve root compression and neuro-anatomic distribution of pain.  (AR 688.)  But in the same form, Dr. Hamilton stated that Brookes's "LS spine has never been imaged" and there is "no CT scan or MRI."  (*Id.*)  Dr. Hamilton also stated that "[n]o imaging study [was] done" to determine if Brookes had lumbar stenosis.  (AR 689.)  Second, as noted above, in April 2012, Dr. Hamilton stated that Brookes did not need to elevate her legs with prolonged sitting.  (AR 695.)  Yet approximately one month later, in May 2012, Dr. Hamilton stated that Brookes was "require[d] to elevate her legs 2-3 times a day."  (AR 768.)  These seemingly contradictory statements should be clarified on remand.

## Conclusion

For these reasons, I recommend remanding to the Commissioner for additional consideration of Brookes's depression and anxiety at step two and later steps of the sequential evaluation, including in determining Brookes's RFC.  I also recommend that the ALJ conduct a new analysis of the medical opinions.  Accordingly, I recommend that

Brookes's motion (Doc. 13) be GRANTED, in part; the Commissioner's motion (Doc. 14) be DENIED; and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling.

      Dated at Burlington, in the District of Vermont, this 24th day of July, 2014.

            /s/ John M. Conroy

            John M. Conroy
            United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).